[No. 18989.    Department One.    April 17, 1925.]

ANTON J. OTTOMEIER, *Appellant*, v. SPOKANE COUNTY et al., *Respondents*.[1]

DRAINS (11, 13)—ESTABLISHMENT—CHANGE IN PLANS—OBSTRUCTION OF WATERS—RIGHT TO INJUNCTION. Owners of low lands, benefited by a drainage district for which they were assessed after completion of the work, and who relied on the construction as completed, are entitled to an injunction prohibiting a dam raising the water to their detriment above the level actually fixed at the time of the completion of the work and the assessment of benefits; and it is immaterial that it had been. originally the intention, theoretically, to fix upon the higher level.

Appeal from a judgment of the superior court for Spokane county, Lindsley, J., entered April 19, 1924, dismissing an action for an injunction, tried to the court. Reversed.

*Carl W. Swanson*, for appellant.

*Chas. H. Leavy, J. W. Graves*, and *E. J. Farley*, for respondents.

PARKER, J.—The plaintiff, Ottomeier, commenced this action in the superior court for Spokane county, seeking an injunction restraining the defendants county and Baker, its engineer and supervisor of its

[1]Reported in 234 Pac. 1036.

drainage district No. 2, from maintaining above a certain level a dam or other obstruction in the head of the main ditch of the district at or near the outlet of Meadow Lake, and also that such injunction be made mandatory in form to the extent of requiring the removal of any such dam or obstruction which has already been placed and now remains in the ditch at or near the outlet from the lake. A trial upon the merits resulted in a denial of the relief prayed for, from which Ottomeier has appealed to this court.

The trial court did not make any findings of fact. A painstaking review of all the evidence, brought here by a full statement of facts, convinces us that there is thereby well established the following controlling facts: Meadow Lake, in Spokane county, is a small body of water which in its natural condition covered probably about 100 acres. It has low, marshy bordering lands of considerable acreage, especially at its northern end. While in its natural condition it seems not to have had any very well defined outlet, apparently the tendency of the flow of its waters was southerly. Below the lake to the south for a distance of two miles or more the land in the bottom of the swale or valley is also low and, in its undrained condition, marshy. These lowlands surrounding and below the lake are capable of becoming by drainage productive agricultural lands.

Sometime prior to the year 1919, the owners of these lowlands initiated, under our drainage statutes, proceedings looking to the drainage of their lands by constructing a ditch from the southerly end of the lake down through the lowlands to the south and thereby lowering the lake, draining the marshy lands immediately surrounding the lake, and also draining the lowlands to the south directly into the ditch. A survey was accordingly made by the county engineer whereby he determined that, for the efficient accomplishment of

the proposed drainage, the bottom of the ditch at the outlet from the lake at its southerly end should be 499 feet above the county's datum plane, and made report of his survey accordingly. The interested landowners were thus led to believe that such proposed level at the bottom of the ditch at the lake outlet was, from an engineering viewpoint, the most appropriate and effi-cient, in view of the drainage proposed to be accomplished.

Thereafter it was ascertained that the drainage district could not be organized and the project efficiently accomplished as originally proposed, though this was not because of the necessity of any material change in the proposed level of the bottom of the ditch at the lake outlet. Thereupon the landowners filed a new petition with the county commissioners looking to the organization of the district and the construction of the proposed improvement on a somewhat less extensive scale than was originally proposed, asking, however, that the level of the bottom of the ditch at the lake outlet be made the same as determined by the original survey; that is, 499 feet above the county's datum plane, assuming that the engineer's survey showed the level to be desired. The engineer thereupon filed a new report of survey, evidently made up largely from data acquired in the making of the original survey, fixing the level of the bottom of the ditch at the lake outlet at 499.5 feet above the county's datum plane. Thereafter such proceedings were had that the improvement was physically constructed and completed before November 1, 1920, on which date it was finally accepted by the engineer, he reporting accordingly to the county commissioners. The landowners then saw the ditch as physically completed, and manifestly were thereby led to believe that the 499.5 foot level fixed in the survey report of the engineer conformed to the level as the

ditch was then physically constructed; that is, the land-owners, not being engineers and not having anything to do with the work of making the survey, were relying upon the level of the bottom of the ditch as actually constructed being the level at which it was to be thereafter maintained.

Thereafter the county commissioners appointed a board of appraisers, as provided by § 4430, Rem. Comp. Stat. [P. C. § 1945-80], to apportion and charge the cost of the improvement against the several tracts of land benefited thereby in proportion to such benefits. The appraisers having filed their report apportioning the cost as they preliminarily determined the several tracts of land to be benefited, upon due notice to all owners of the lands so charged with the cost of the improvement, the matter of final approval and adjustment of such charges and assessments came regularly on for hearing before the county commissioners as the law provides on February 8, 1921, and by adjournment, on March 14, 1921. No owner of any of the land so charged protested or objected to the manner of the construction of the improvement. They were, of course, advised in that respect by the physical appearance of the improvement as already completed, since it had been completed and approved on November 1, 1920, several months previous. It is worthy of note in this connection that § 4430, Rem. Comp. Stat., plainly provides for the making of assessments and the hearing thereon after the "improvement is fully completed."

On March 14, 1921, the county commissioners adopted a resolution and order approving and confirming the assessments, after making some slight changes; no change being made, however, in the assessment against the land of Ottomeier, which was $862 in amount. No appeal was taken from the assessment so made, by

Ottomeier or any of the other landowners. Indeed, they apparently were all satisfied with the manner of the physical construction of the improvement and with the assessments made against their several tracts of land benefited thereby. So, of course, the assessments became final and conclusive, and all parties, including Ottomeier, are now deprived of relief so far as cancelling or lessening the charges and assessments against their several tracts of land are concerned.

The level of the bottom of the ditch as constructed at the lake outlet remained unchanged for a period of approximately two years, during which time the ditch efficiently accomplished all that was anticipated in its construction with reference to the lands bordering on the lake; that is, it lowered the waters of the lake and thereby drained a large portion of lowlands. Upon Ottomeier's land, during the years 1921 and 1922, he raised large crops which he had theretofore not been able to do.

In the fall of 1922, some owners of the lowlands below the lake outlet through which lands the ditch ran, conceived the idea that the bottom of the ditch at the lake outlet had been lowered below the level as originally constructed, and, with a view of restoring what they conceived to be such original level of the bottom of the ditch at the lake outlet, induced the county engineer, as supervisor of the district, to construct at the head of the ditch at the lake outlet a concrete dam, the top of which, according to a survey then made by the county engineer, was 499.5 feet above the county's datum plane. This, of course, theoretically would seem to be the correct level of the bottom of the ditch at the lake outlet; but the fact remains, as we think the evidence shows, that the top of that dam was at least eight inches above the level of the bottom of the ditch at that point as then existing and as it had existed

since the construction and completion of the ditch on November 1, 1920. The construction of this concrete dam resulted in again raising the waters of the lake and rendered a large portion of the theretofore drained lands of Ottomeier adjoining the northern end of the lake wet and soggy and unfit for cultivation. In other words, the construction of this dam had the effect of destroying to a large extent the benefits the land of Ottomeier had received and was receiving from the ditch as originally constructed and as it had physically remained since its original construction. It seems to us that the evidence also shows that the construction of the dam was of but slight, if any, benefit to the owners of the lands along the ditch to the south, though that is not wholly certain. This, however, seems to us to be immaterial in our present inquiry.

In view of the facts above summarized, we think our problem as to Ottomeier's right to have the level of the bottom of the ditch at the lake outlet restored to the level at which it was originally physically constructed and remained up until the time of the construction of the dam, is a comparatively simple one. It seems to us that the trial court must have denied relief to Ottomeier upon the theory that the engineer, as supervisor of the district, was warranted in building the concrete dam in the head of the ditch at the lake outlet so that its top would be at the level of 499.5 feet above the county's datum plane, because that was the theoretical level of the bottom of the ditch determined upon by the survey for its original construction, regardless of the level at which the bottom of the ditch was physically constructed and thereafter maintained. The bottom of the ditch at the lake outlet having been actually fixed by its physical construction; Ottomeier and other owners having relied upon that as the improvement they were being charged for, and being satisfied with it, and

having been so induced to refrain from challenging their assessments, and being now without relief as against the assessments; and the fact that to now raise the level of the bottom of the ditch at the lake outlet would largely destroy the benefits they supposed they were receiving from the improvements, we think argues all but conclusively that Ottomeier is now entitled to have the level of the ditch at the lake outlet remain as actually constructed though it be not at the theoretically established level.

We conclude that Ottomeier is entitled, under the facts here shown, to an injunction restraining the county and its engineer, supervisor of the drainage district, from maintaining a dam or other obstruction in the head of the ditch at the lake outlet or elsewhere in the ditch above a level of eight inches below the top of the concrete dam as constructed, and is entitled to have such injunction made mandatory in form to the extent of requiring the removal of all such dams or obstructions which may have been placed and are now in the head of the ditch at the lake outlet. It is so ordered.

We make these particular observations as to the right of Ottomeier to have the injunction made mandatory in form to this extent, because it appears that the concrete dam has been partially removed and another obstruction in the nature of a log dam has been constructed with a view of accomplishing the same purpose that was intended to be accomplished by the construction of the concrete dam. Ottomeier's wife is a party plaintiff with him in this case, made so evidently because of the fact that the land involved, which is sought to be protected in this action, is their community property. We have spoken of Ottomeier as a sole plaintiff merely for convenience of expression. Of

course, Mrs. Ottomeier and the community will share in the fruits of our disposition of the case.

The judgment is reversed, and the superior court is directed to award injunctive relief as we have herein indicated.

TOLMAN, C. J., MAIN, BRIDGES, and ASKREN, JJ., concur.